The plaintiff's appellant has ceded five minutes of their time to amicus and the time will run separately. So you'll see your ten minutes includes any rebuttal that you may wish to say. Good morning, Your Honors. May it please the Court. My name is Mr. Inder Kumar on behalf of the appellant. I'd like to reserve four minutes for rebuttal and I'll watch the clock. I'm going to be speaking about domestic law issues, but the Westfall Act in particular. I will be talking just to give the Court a roadmap first about the general framework of the Westfall Act and why we believe remand or reversal is appropriate. And I'll also be talking about D.C. case law and why the second amendment complaint raises a presumption under D.C. case law requiring reversal and remand. My colleague, the amicus, Dr. Dubler, will be speaking about international law. So that can be reserved for next time. So for purposes of your argument, you're assuming the validity of the Westfall Act. For this purpose, yes. Yes, that's correct. I'd like to get into those issues and then in the rebuttal, you know, I can get to it. Yeah, absolutely. So, you know, when we're talking about the Westfall Act, as the Court knows, the framework is the Gutierrez case. And it's, I guess it's a second case being the Osborne case that is covering, you know, how district courts, the instructions of the Supreme Court, giving the district courts as to how a district court should review immunity that is being posited by the district. Well, let's get to the case. As I read the cases, federal employees' actions can be pretty darn wrongful and still be covered by the Westfall Act, still be part of their employment. And therefore, subject to the immunity of the Westfall Act. Do you disagree with that as a general principle? I don't disagree with that as a general principle. Okay. So what's different about this particular thing that was wrongful that somehow makes it different from the other wrongful acts that are subject to the immunity? I think we have to get into the weeds of D.C. law and take a look at the D.C. law cases I've spent more time than I would have wanted to look at these D.C. law cases. Okay. As I read them, and as a former torts professor, they seem to be playing fidelity towards agency cases. Say stuff like, look, I know your employer didn't want you to drive drunk, but when you left delivering his product to the next people and you stopped in a bar and drank a local thing, you were still in the course of your employment when you started delivering. Yeah. So why isn't that here? Here we have some people who for good or put aside the international law questions were authorized by Congress to do stuff. And they did it. They may have been terrible, but why wasn't it within the scope of their employment? So I'd like to point the court to four cases, D.C. law cases. And those are briefed in Stokes, Hicks, Boykin, and McDonough. I think we have to get in the weeds. Well, no, don't get in the weeds. Tell us in plain English terms, not citing cases, why this wasn't in the course and scope of their employment. Well, because when these defendants allegedly are involved in this level of arguable misconduct, the D.C. cases say you have to examine those specific allegations. Those D.C. cases say you have to look at those allegations in the context of what they were employed to do. Sure. And these folks were employed to conduct foreign policy of the United States. It may have been an awful foreign policy. It may have been internationally illegal. It could also have been for purposes of your argument. But is there any argument that they weren't conducting the foreign policy of the United States, if they were off on what in tort law we would call a detour in a frolic? Sure. I think the Boykin case does that. Really? Yes, absolutely. How? Because in Boykin, you have a specialized instructor who's on the job at the school assaulting a student. Yeah, but that's the same as Mr. Conway. Right. He has duties to assault students. Right. But I also think it seems like your argument is primarily one about motive versus what they actually did. And you seem to say that if you have ill motive, even if it's within the scope of your employment, that somehow takes it out of the scope of your employment. Right? By the way, so, for example, let's look at this case. If these individuals were to say, we believe that we had no motive prior to taking office to engage in war, we made the decision not to target, but we thought it was the best decision, would you still have this argument? Well, I would. I think that. Well, it seems to me that your argument conflates what you call personal interest with a political philosophy or point of view. It's as if someone said, well, I really want to go work for the Civil Rights Division because I think there's been voter suppression, and it really matters to me to have voting rights be indicated. And then they go to work for the Department of Justice and the Civil Rights Division, and they prosecute those cases. They're doing it out of a personal motivation, but it's not personal. They're acting within the course and scope of their employment to prosecute those cases. And similarly here, people may have had a political view that this was a good idea, but it wasn't personal in the sense of they're going to get money out of it, that's not alleged, you know, in this case at all. So I don't understand how, why that's personal in the sense that you're using it. Well, in the D.C. cases, you know, that's why you keep talking about the D.C. cases. Let me take Boykin. Okay. Boykin was not part of the person's job in that case to assault students. Sure. Part of the person's job was to instruct students. Right. Part of the job of each of these individuals was to conduct a foreign policy and ask what you're suing them for, including the decision whether or not to engage in military action. That's actually part of their job. It's not as if you argue that if you want to introduce the Secretary of Education and decide as a result to participate in some policy force that's placed to military action, their foreign policy scope of employment included decisions regarding military action, did it not? It did. But then you look at the Stokes case, and in Stokes you have, you know, the allegations there are about someone making employee reviews, right? So someone who was acting on a scope of their authority made the allegations that they did those employee reviews for an ill motive, and there's no financial interest at Stokes. In the assault cases and the rape cases that are coming out of the D.C. case law, there's no allegation of financial interest in those cases. You have to reach a financial attorney. If these defendants had been injured while doing this job, could they seek workers' compensation? I mean, I don't have access to that information. It's a legal question. It's a legal question. I think within the course and scope of their employment, if one of them had fallen down and injured his hip while going to the. . . Well, Ford's was on his way, you know, on his way to conducting what you say is a legal war to meet with J.D. And on the way down, he got into the White House and tripped over something. Wouldn't he be hurt in the course and scope of his employment? You have to look at D.C. . . . I'm asking you a question. Yeah. You've looked at D.C. law. Wouldn't there be hurt in the course and scope of their employment under those circumstances? For workers' compensation? Yeah. Because D.C.'s interpretation of course and scope arises from drug law, does it not? For workers' compensation. It's agency law. So we're trying to figure out in a case like that, was he about the business of his master? Or was he off on a frolic or detour? Well, I think you'd look to see where he was walking down the hall about that day and what his business was. You know, you can't keep changing the right to federal. See, what troubles me about this. . . Yeah. I know. Is that this is really classic course and scope stuff that everybody would say, if your employer's business is to conduct illegal wars, then while you're conducting it, you're in the course and scope of his employment. Then you have to grapple with what are the outer boundaries of the West Lawn. That's hopefully what somebody else is going to talk about. Right. Because on the face of the act, you're covered. Are you not? We're covered. On the face of the act, you're covered. There's no exception on the face of this. That's correct. Yeah. So I don't see a problem. You're right. We may do that. May it please the Court. I am Curtis Tobler, representing Amicus Curia Lawyers for International Law. I'm going to address issues related to international law on this matter, because we think that that is the crust of this matter. As your honors have already indicated, there is an issue about the nature of the act. This is not your customary tort. This was an action that destroyed the lives of millions of people. We're not talking about whether or not a government official merely does something that might be, in his terms of employment, in his office, that causes some damage. Mayor, can we stop you for a second? Because I want to understand the difference in the argument you're making. Your colleague says we should not find the Westfall Act to apply, because they weren't acting within the course assumed by the requirement. Let's assume that they were, for a moment. Are you making an argument that even if they were, the Westfall Act doesn't apply? We argue that the Westfall Act should be interpreted, in relation to that particular phrase, scope of office, as not including actions which are violations of just cogent norms of international law. Let me just ask one more question, so I understand your argument. Assuming that we were to determine that the Westfall Act as a matter of statute or interpretation applies, do you have any argument about why it shouldn't? We believe that the Westfall Act should not apply to just cogent violations of international law. Even in the last session of Congress, they've said that the Westfall Act would re-immunize you for anything in the course and scope of your employment, including just cogent violations. Let's just assume that the Act said that. Would the Act then apply to the circumstance? The Act may apply, but we would say that it is still the actions taken under that Act. The government would, of course, have the discretion to decide to try to apply that Act, but we would argue that a court should not acknowledge that application because the actions that Act should be interpreted as not included in the interpretation matter for you. Let's assume Congress, tomorrow, because you won this case, passes a new Act that says, and by the way, we mean this immunity to include just cogent violations or treaty violations or violations of the norms of international law that are alleged to have occurred during the scope of your employment by the federal government. Let's assume that's what the Act says for purposes of my question. Under those circumstances, would these defendants be entitled to immunity? It is likely they would. Okay, so you're not making an argument that the Act is invalid. You're arguing that we should interpret the Act so as not to cover, or at least to correct immunity. That's very helpful to me. We are arguing that that is the case because international law, treaties that have been ratified by the United States, clearly establish that this is a preemptory norm of international law, that not only states cannot engage in aggression against other states, with very few exceptions, and there are exceptions that might lead to a state justifying the use of force. In fact, the United States in this case did try to justify its use of force using . . . What were the dates of the treaties and other obligations that you assert established this principle? And the reason I ask that question is that a treaty can be abrogated by a statute that has equal dignity, but Congress can say, well, never mind that treaty. This is the law from here forward. So are these things that arose after the enactment of the Westphal Act, or are they things that arose before? These treaties are treaties that arose before, Your Honor, but we are arguing that not only treaties, but customary international . . . But the customary law, as you are doing, I mean Rupreef is quite good on this, you are doing some longstanding . . . No, it didn't arise after 1988. That's correct. So let's go back to Judge Graber's question. Let's assume that all this was through. Couldn't Congress have said in the Westphal Act, well, we . . . Let's turn that off. Thank you. But we want to pass an act that says something different. Yes, they could have, Your Honor. They did not. So what . . . Can you point to us in this legislative record, or anywhere, that would allow us to interpret a statute to mean that these exceptions exist? They've actually, in another act, talked about various exceptions. So why should we interpret the Westphal Act and that would include this exception in terms of unity court? What can you point to? Some of the record, Your Honors, have already mentioned that this is usually applied to instances of employee misfeasance, you might say. But our argument . . . That's not what I'm talking about. I'm not talking about employee misfeasance. I'm talking about the idea that we should read into the Westphal Act, this exception to unity that you say exists for customer international law. Where does that come from? We believe that comes from the Constitution and from the decisions of the courts of the United States, including the United States Supreme Court, that said this law is part of the law of our land and should be applied as federal law by any federal court. And that law . . . But that's what Judge Graber said. And so, go back to that. We were always going to say Washington State, but we're trying to sharpen it for you. Judge Graber said, fine, let's assume all that. In 1988, Congress passes a statute which, on its face, as your colleague candidly admits, and I think he's tightly correct, appears to apply to all actions of federal employees. So why is it that we should read this statute, where Congress used fairly plain language, to carve out an exemption for preexisting employees? Because we do not believe that Congress used plain enough language to indicate that people should be, that government officials should be allowed to violate just quotient provisions of international law. Those are special provisions of international law, as we have seen in this case. It can cause not harm to just one person, a few people. It can cause harm to millions of people. It is estimated 1.5 million people. We take everything into account. It's true. So you don't need to reiterate it. My senior position is that when Congress intends to immunize federal officials against violations of norms of international law, it must do so exquisitely. Yes, Your Honor. What case do you cite for that conversation? We look at what we have argued in our brief, is that international law is part of the law of the United States, and we believe part of the highest law of the United States. For example, which I don't contend it's higher, you admitted at the beginning Congress could override it if they do so expressly. Right. So I'm asking you a very specific question. Is there any case law to support your proposition that when Congress wants to override, when Congress wants to override a prior statute, Your Honor, you can do it without especially saying, and by the way, we're overriding a prior statute here. What case do you cite for the proposition in the Jess Coggins area? It must be more specific. We will not cite a case for that, Your Honor, but we think that that is a very strong argument of public policy, that the United States Congress should not be assumed to have decided that they will override a principle of Jess Coggins of international law, because that would mean that the United States then is acting in a way that it is represented to the rest of the world on its most solid basis that it will not act when the United States enters into a treaty or when it agrees as it has here through resolutions, other manifestations, public statements. It represents not only to the people of the United States but to the rest of the international community that it will act in accordance with accepted norms of international law, customary international law, particularly Jess Coggins norms of international law, and when that is not done, we believe that is a very serious violation of that obligation that will interfere with our ability as a country to be able to effectively interact in foreign relations. Thank you, Dr. Tiller, for your comments. We will hear next from the United States. Thank you. May it please the Court. Patrick Monroe from behalf of the government. I think it's the discussion to this point has revealed or indicated the question before the Court is a narrow one of domestic statutory interpretation. Whether under the West Wallach, the United States properly certified that the former president and other senior officials were acting with the scope of employment when they conducted foreign policy by conducting their own war, that question is answered by looking to District of Columbia respondents of fair law, and under that law, it's clear that they were acting in the scope of their employment. The West Wallach has two exceptions. In that way, it's contending that either would apply. Exactly, and so in the absence of either of those exceptions, they had that. What are the limits of your argument? Let's assume that rather than getting congressional authorization in this case, this group of defendants got together and said, I'm mad at Saddam Hussein for what he did to George H.W. Bush or something like that, so let's go attack Iraq and bomb the heck out of it. Would there be civil liability under those circumstances? Well, I'm on the third prong of the DC test, which is I think your hypo goes to whether the actions would be for purely personal motivation or whether in any part to serve the employer. I think that would be a very hard prong to satisfy. Your honor's hypothetical, but at least get a little bit closer to showing that, you know, maybe there was at least some personal motivation here. The only allegations here are that the individuals had certain ideological views, but I think as Judge Graber's question pointed out earlier, those views are on behalf of the United States. Well, it depends a little bit, doesn't it? To go further with Judge Hurwitz's hypothetical, it depends a little bit on whether they were generic political views or personal, truly personal, because if the idea was to get a particular, let's say, taken away from the Middle East, let's say someone really hated Castro for what he had done to their grandparents or whatever and was just determined, you know, not determined to start a war with Cuba, that might get personal even if it represented a political view and even if the person were hired in the State Department, yes? Well, it would be getting closer, but I think two things. First, just under DC law, which obviously is not tailored precisely to the context of a president deciding whether or not to go to war, but under DC law, the test is whether it's purely for personal purposes or whether any part of it is to serve the employer. So it's a pretty exacting test. And then to Your Honor's hypothetical, obviously when you're talking about politics and why an individual has certain political or ideological views, I mean, there could be a whole range of motivations that go into that, which is precisely why a court should be very wary of engaging in that sort of analysis. Well, although we wouldn't be wary at all of it if the DC respondeant is superior, below, or broader. It's sort of a strange thing you're telling us. It's not within our expertise, because the state courts, if you will, in DC have defined respondeant superior narrowly. So should we certify this issue? It's an interesting question, but let's say, to have it even further, what if they found in personal diaries of their citizens that said, I vow when I take office, no matter what the circumstances, to wage war of aggression? What would be the outcome then? I think even in those circumstances, if the reason that they vowed to wage this war was because they thought it was in the best interest of the country, then that would satisfy the third prompt. So I don't understand why that would take it. Because it sounds like you're saying no matter what, there is essentially a sort of limitless and boundless unity for these individuals, regardless of their motivation, because you know your knowledge, theoretically, that there could be this sort of primary motivation outside the context of Soviet IMG. You've yet to acknowledge a sort of factual pattern which would establish that in these circumstances. What would, in your view, can you give us an example of where the limit could be? Well, I think what the D.C. law is going towards, and again, it's obviously not tailored towards this sort of political environment, but is where an individual is going to personally gain, for example, financially from doing something at work. That's the motivation for taking the action. If the motivation is, say, being a defense contractor later or consulting with companies that provide weapons, would that be enough? If the allegations suggested that that was the sole motivation, then that would be getting quite a bit closer. But here, we don't have any allegations of any financial gain that these individuals were seeking to profit from in engaging in war, and certainly nothing that satisfies the exacting D.C. standard, which is solely for personal benefit. And the sort of ideological views that we're discussing really fall squarely within what you would expect a politician or somebody who expects to hold a senior office in the government. Those are the views they should be moving forward for the public to understand before they take the action. So let's assume that the policy of some government defenders, I don't want to impugn these particular defenders, were to be to exterminate everybody in the country of a particular religion, and they persuaded Congress it was a good idea, and they engaged in some sort of holocaust in the country. Would they be acting, would they be immunized by the West Wing? Well, I think it would be, obviously, a significantly harder question maybe on the first prong of whether this is the sort of action that the individual Well, our government's done this before. But what I would say is, you know, maybe not, but there are a tort claim against the president isn't really the primary way or really isn't. There are lots of checks and balances, obviously, built into the system. And here, as Your Honor noted, Congress authorized this war. That's obviously an important check. So the fact that an individual plaintiff might not be able to bring a tort claim against that individual without it being certified under the West Bloc doesn't mean that there aren't lots of protections in place against the sorts of actions that Your Honor is describing. Well, let me ask you this question. Given that this incredibly high standard you've established in respect to the Supreme Court, wouldn't that then, conversely, support their having been in a military hearing? Because if you set the standards so high, no one is going to be able to meet it. And therefore, they'd never be entitled to an evidence hearing. They'd never be entitled to be able to bring the claim. But doesn't that support the idea that, in fact, we should at least reverse with respect to the evidence hearing to establish that? Because you're essentially alleging information. It's almost impossible that someone who's alleged to have a claim would have that possession and be able to demonstrate it. I don't think so, Your Honor. I mean, the district court accepted all the allegations as true. I said that the standards still couldn't be met. So that's a pretty, when a court does that, you know, in a 12-B-6 context, for example, that's obviously permissible. And here, the district court applied that standard to those allegations as accepted. And I just want to push back. I mean, obviously, there are cases under District of Columbia law where the court held that actions were outside the scope of the employment. But these allegations just aren't. Counsel, what is the procedural fallout from coverage of the West fallout? That is, the United States is substituted as the defendant, and the individuals cannot be held personally liable. But isn't there still, if the proper procedures have been followed up, toward a claim against the United States? That's exactly right, Your Honor. So it's not the, the Westfall Act doesn't preclude liability. It channels it to government liability rather than personal, individual liability, correct? That's right. And it doesn't do more than that. So that if these plaintiffs had satisfied the requirements of the Federal Tort Claims Act, they can still proceed. That's right. And just to return to Judge Hurwitz's question, because I think that is responsive, in the sort of facts that Your Honor was positing, not only would there be, presumably, an MTCA claim against the government, but those sorts of allegations would raise constitutional claims, which are an exception to the Westfall Act. Well, and I suppose you might also argue that the international law doesn't cover subpoena liability. And that's another question that we might have to confront in this case if we're going to get there. In other words, I take it the international norm establishes that violators ought to be held to justice for their violations, perhaps by international courts, but it may not establish a tort claim system for them. That's right. I mean, I don't know that any court has trust, whether under the Alien Tort Statute you can establish civil liability, you know, under this particular international law claim. But, of course, the Westfall Act certification has to be addressed first, so those sorts of issues. And do we address the Westfall Act, the question that you're trying to raise, the Westfall Act certification? Do we look at that as if it were a summary document? In other words, the Attorney General doesn't certify, or certifies that it was with a disciplinary authority. And there's a presumption that he's correct or she's correct, depending on which Attorney General it was. But do we then just look at that presumption the way we would look at a summary document to see whether there's any contrary information, or must there be a certain level of proof to do this presumption? Well, I think once you get to an evidentiary hearing, I think the presumption does some work. But here, where what the district court did was simply accept all the allegations as true. And put plaintiff's allegations. And put all the plaintiff's allegations. That, you know, it's not as if the district court was putting the plaintiff to some evidentiary burden. We're putting up to a plaintiff burden. And your view is that under the facts of this case, no facts could be played to get them past the burden? Well, certainly, none of the facts they apply to help them pass the burden. But isn't it your view that given the facts of this case, there are no facts that could be played to get them past the burden? That would be our opinion. I'm happy to answer any other questions. I think we have no more questions for you. Thank you. Thank you. And Mr. Indicomar, you have some time remaining. Thank you, Your Honors. You know, one of the things that counsel mentioned was this kind of messengers to the country in Bronx. You know, I guess we talked briefly on the scope of D.C. law in terms of what counts as a personal motivation. I don't think, you know, the D.C. courts don't say anywhere that it has to be purely financial. They don't say that, you know, especially given the assault context, there is certain conduct that people can do that points in the direction of personal motivation. Right. But it has to be under D.C. laws that are really purely personal motivation. That's correct. But once the plaintiff, you know, in these cases, the plaintiff's alleged enough, or they're led to go to a jury or have some kind of evidentiary hearing where that conduct is scrutinized, then the court's reviewing it. But can you ever have purely personal motivation when the Congress of the United States authorizes the law? Well, we allege a pattern and practice of misrepresentation to hold the plaintiffs. Right. I mean, that's another key point, is that when you look in the cases, misrepresentation is the thing that the courts look at. You know, if someone is making things up, that's a factor that courts look at. And, I mean, the cases for that are stokes and hicks. Again, so you have allegations of misrepresentation. So in this fact pattern, we allege the executive branch engaging misrepresentation to the Congress. Congress passes a bill. They go out and do what they want to do. I mean, that seems to me like pointing in the direction, again, of some type of personal motivation that would require the court to analyze that at least or look at those cases and then, you know, possibly think about what type of evidence is necessary. And one of the things that's telling is when you look at, again, the Osborne case, Osborne says, you can't think the district courts have to do some work. Right. That's footnote 18. The law is in the footnotes. Right. So when you look at footnote 18, you know, the imputation from the Supreme Court is that, especially with this specific immunity, there may be other immunities. There may be other defenses. But at least with West Fallout immunity, district court has to do a little bit of heavy lifting. That's what the cases say. We don't think they're meant to lift. It's done here. I can talk very briefly about some of the, I don't know. If you've exceeded your time, then you may wrap up with a sentence or two if you'd like. Yeah, sure. I mean, with respect to the other argument that we haven't touched on yet, the Abdullahi argument, you know, when you analyze the norm of aggression, looking at who's liable, how can they be liable, that type of framework, I think you can look at Abdullahi and analyze the argument, too. And what is the scope of a domestic immunity defense when you're talking about aggression? I think that's something the courts should consider as well. Thank you, counsel. The case just started. You did submit it. And we very much appreciate the arguments of all three of you. They've been helpful. And, again, this is a most interesting and challenging case. With that, we are adjourned for this morning's document.
judges: Graber, Hurwitz, Boulware